**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

RENEE JACKSON,                    :
         Plaintiff,              :
                                 :        CIVIL ACTION NO.
    v.                           :        3:07-CV-471 (JCH)
                                 :
AFSCME LOCAL 196, et al.,        :        MARCH 29, 2010
         Defendants.            :


**RULING RE: MOTION FOR SUMMARY JUDGMENT (Doc. No. 309),**
**MOTION FOR LEAVE TO FILE EXCESS PAGES (Doc. No. 339), AND**
**MOTION TO STRIKE (Doc. No. 340)**

**I.    INTRODUCTION**

Renee Jackson ("Jackson"), a former employee of the Connecticut Lottery

Commission ("CLC"), originally brought this suit against various Connecticut state

officials and agencies (collectively, "state defendants"),[1] as well as AFSCME Local 196,

her former union; Union officials Carla A. Boland and Linn Miller; and AFSCME Council

4 (collectively, "Union Defendants").  Jackson alleges various federal and state civil

rights violations.  The Union Defendants have moved the court for summary judgment

(Doc. No. 309).  The court herein addresses that Motion, as well as a related Motion for

Leave to File Excess Pages (Doc. No. 339) and Motion to Strike (Doc. No. 340).

For the following reasons, the Union Defendants' Motion for Summary Judgment

is granted.  The Motion for Leave to File Excess Pages is denied.  The Motion to Strike

is denied.

---

[1] On May 18, 2007, the state defendants filed a Motion to Dismiss (Doc. No. 14), which this court granted in a Ruling dated June 29, 2007 (Doc. No. 51).  The instant Ruling does not concern the state defendants.

## II.    FACTUAL BACKGROUND[2]

Jackson, an African American woman, was employed from June 2001 until April 2004 as a secretary by the CLC.[3]  L. R. 56(a)(2) at ¶ 10.  As a CLC employee, Jackson was a member of AFSCME Local 196 ("the Union"), which is "the exclusive bargaining agent for . . . clerical employees at the CLC."  L.R. 56(a)(1) at ¶¶ 5, 8.  At all relevant times, Jackson was covered by a collective bargaining agreement ("CBA"): the first CBA was operative from the beginning of Jackson's employment until June 30, 2002, and the second CBA was operative beginning July 1, 2002.  Id. at ¶ 11, 71.  In January 2002, Jackson was promoted from the position of Legal Secretary to the position of Secretary 2.  L.R. 56(a)(1) at ¶ 12.

The events giving rise to this dispute began on or about January 23, 2002, on which date Jackson attended a CLC staff meeting where "new mail handling procedures" were discussed.  L.R. 56(a)(2) at ¶ 15, L.R. 56(a)(1) at ¶ 15.  At that meeting, Jackson expressed "concerns about handling mail when there was the scare of possible anthrax contamination," and then "walked out" of the meeting.  L.R. 56(a)(1) at ¶ 15; Affidavit of Renee Jackson at ¶ 27 (hereinafter "Jackson Aff.").  Jackson's

---

[2]  For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving plaintiff, where there is evidence to support her allegations.

    The court notes that the plaintiff disagrees with much of the Union Defendants' Local Rule 56(a)(1) Statement, but the evidence cited indicates in fact that the plaintiff is in agreement with many of the facts contained therein, just not with the bases for those facts.  Because such disagreements do not evidence a dispute of fact, the court will deem those to be admissions.  To simplify the reading of this Ruling, the court will only articulate those instances where it finds the plaintiff has actually disputed an issue of fact.

[3]  Jackson admits the Union Defendants' allegation that she began work as a secretary for the CLC beginning in September 2001.  L.R. 56(a)(2) at ¶ 1.  However, she states that her employment at CLC began in June 2001.  Id. at ¶ 10.  It is not clear to the court what position Jackson held at the CLC between June and September 2001.

supervisors at the CLC perceived her behavior at the meeting as unacceptable; consequently, Jackson was issued a "letter of counseling."  L.R. 56(a)(1) at ¶ 15. Jackson was issued a second letter of counseling in April 2002, which described "three areas of concern: 'attendance, technical training, and [Jackson's] general ability to deal with other employees within the organization.' " Id. at ¶ 18.  This second letter of counseling extended Jackson's probationary period in the position of Secretary 2.  Id. at ¶ 19.  On June 10, 2002, Jackson was issued a "Letter of Reprimand" regarding her continued "inappropriate behavior" at CLC.  Letter from John Ramadei and James McCormack to Renee Jackson at 2.   Thereafter, on June 25, 2002, Jackson was demoted to the position of Legal Secretary.  L.R. 56(a)(1) at ¶ 67, SBLR Decision and Dismissal of Complaint at 13 (hereinafter "SBLR Decision").

In 2002 and 2003, Jackson filed nine grievances against the CLC related to, inter alia, the aforementioned letters of counseling, letter of reprimand, and demotion. Several of these grievances referenced Jackson's allegation that a higher level CLC employee, James McCormack, had sexually harassed her.  Each grievance was signed by a Union representative.  Jackson ultimately executed a settlement with the CLC in April 2004.  L.R. 56(a)(1) at ¶ 101.  The Union then withdrew all then-pending grievances against the CLC.  Id. at ¶ 103.

On or about December 14, 2004, Jackson opened a case against the Union Defendants before the Connecticut State Board of Labor Relations (hereinafter

"SBLR"), alleging a breach of the duty of fair representation.[4]  L.R. 56(a)(1) at ¶ 128.

Between 2005 and 2007, the SBLR held eleven days of hearing on Jackson's

complaint.  SBLR Decision at 1 (hereinafter "SBLR Decision").   In addition, the SBLR

ruled on various motions, counter-motions, and requests of the parties.  Id. at 1-2.  In a

Decision dated April 29, 2008, the SBLR held that the Union Defendants had not

breached their duty of fair representation to Jackson.  Id. at 33.

Jackson filed a complaint against the Union Defendants with the Connecticut

Commission on Human Rights in February 2005.  L. R. 56(a)(1) at ¶ 136.  This

complaint alleged that the Union Defendants had discriminated against Jackson on the

basis of her race and sex.  See Affidavit of Illegal Discriminatory Practice at 1.  Jackson

alleged that the Union's conduct amounted to violations of Title VII and various

provisions of Connecticut law.  Id.  On February 22, 2007, the United States Equal

Employment Opportunity Commission sent Jackson a letter denying her claim, stating

that "[t]here is no evidence of violations of the statutes."  Letter from Benjamin Nidus to

Renee Jackson at 2.

## III.   PROCEDURAL HISTORY

Jackson originally filed this lawsuit in federal court on March 27, 2007 (Doc. No.

1).  On May 8, 2007, Jackson filed an Amended Complaint (Doc. No. 11) (hereinafter

"First Amended Complaint").  The Union Defendants filed a Motion to Dismiss the First

---

[4]  The December 2004 case was actually the third opened by Jackson in the SBLR. Jackson's first
SBLR complaint was filed July 11, 2003, L. R. 56(a)(1) at ¶ 115, which complaint was withdrawn by
Jackson on January 26, 2004.  Id. at ¶ 116.  Jackson filed her second SBLR complaint on February 23,
2004.  Id. at ¶ 117.  Jackson's second SBLR case was closed on May 18, 2004, after Jackson did not
appear at a telephone conference and subsequently failed to respond to communications inquiring as to
whether she intended to pursue the case. Id. at ¶¶ 119, 120, 122.

Amended Complaint on June 18, 2007 (Doc. No. 35), which this court granted in part in a Ruling dated July 26, 2007 (Doc. No. 70) (hereinafter "July 26 Ruling").  In the July 26 Ruling, the court granted the Union Defendants' Motion to Dismiss as to Jackson's claims under 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(c)(3) (hereinafter "section 703(c)(3)"), and section 301 of the Labor Management Relations Act.  The court denied the Union Defendants' Motion to Dismiss as to Jackson's claims under 42 U.S.C. § 1981 (hereinafter "section 1981"), and Conn. Gen. Stat. § 5-271(d).  The court granted Jackson the right to replead her Title VII claims against the Union Defendants.  Consequently, on August 20, 2007, Jackson filed a document entitled "Third Amended Complaint"[5]  (Doc. No. 91).  A lengthy discovery process ensued.[6]

On August 13, 2009, almost two years after Jackson filed her Third Amended Complaint, the Union Defendants filed the instant Motion for Summary Judgment (Doc. No. 309).[7]  Attorney Miller filed her original Memorandum in Opposition on October 5, 2009 (Doc. No. 316).  On October 9, 2009, the Union Defendants moved the court for sanctions against Attorney Miller on the ground that Attorney Miller's service of her original Memorandum in Opposition was untimely (Doc. No. 317), which Motion was

---

[5]  While the court will refer to this document as the "Third Amended Complaint," which is how it appears on the docket sheet, there is no "Second Amended Complaint" in this case.

[6]  Jackson proceeded in this case pro se until November 30, 2007.  On that date, Jackson's current counsel, Josephine Miller, filed a Notice of Appearance (Doc. No. 130).

[7]  The Union Defendants never moved to dismiss the Third Amended Complaint.  Further, the Union Defendants' Answer to the Third Amended Complaint was not filed until August 12, 2009, almost two years after the Third Amended Complaint was filed (and only one day before the Motion for Summary Judgment was filed).

denied on October 15, 2009 (Doc. No. 322).  On October 20, 2009, Attorney Miller filed a Motion for Leave to File a Corrected Memorandum in Opposition (Doc. No. 323) (hereinafter "Corrected Memorandum").  In a Ruling dated October 30, 2009 (Doc. No. 325), the court granted that Motion and denied the Union Defendants' corresponding Motion for Articulation of Changes (Doc. No. 324).  On November 2, 2009, the Union Defendants moved the court to reconsider its denial of the Motion for Articulation of Changes (Doc. No. 326).  The court granted that Motion for Reconsideration only to the extent that it requested additional time to file a Reply Memorandum, setting a new deadline of November 30, 2009 (Doc. No. 327).  On November 19, 2009, the Union Defendants moved to strike Jackson's Affidavit and Local Rule 56(a)(2) statement (Doc. No. 331).  Four days later, the Union Defendants again moved to extend the deadline for the Reply Memorandum  (Doc. No. 333).  The court denied the Motion to Strike on December 15, 2009 (Doc. No. 336).

The Union Defendants finally filed a Reply Memorandum and attachments on December 29, 2009 (Doc. No. 337).  The Reply Memorandum totals 60 pages, which is six times the limit contemplated by Local Rule of Civil Procedure 7(d).  Accompanying the Memorandum are 136 pages of exhibits and 143 pages of unpublished cases.  On the same date, the Union Defendants filed a Motion for Leave to File Excess pages, as well as a 45-page Motion to Strike "selected statements and documents" from Jackson's Memorandum in Opposition to the Motion for Summary Judgment.

## IV.   MOTION FOR LEAVE TO FILE OVERSIZED REPLY (Doc. No. 339)

The defendants' Motion for Leave to File an Oversized Reply Memorandum is denied.  In the court's view, a 60-page Reply Memorandum is excessive.  While

6

Jackson's Corrected Memorandum is 66 pages long, which is more than is contemplated by the Local Civil Rules in this district, the court sees no reason why the defendants needed six times the number of pages contemplated by Local Rule of Civil Procedure 7(d).

## V.    STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id.  In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Fed R. Civ. P. 56(c); Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. National R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.' " Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d

Cir.2007)); see also Havey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir.

2008) (stating that a non-moving party must point to more than a mere " 'scintilla' " of

evidence in order to defeat a motion for summary judgment) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 252 (1986)).

## VI.   DISCUSSION[8]

### A.   Section 1981

Section 1981 provides that, "[a]ll persons . . . shall have the same right . . . to

make and enforce contracts, to sue, be parties, give evidence, and to the full and equal

benefit of all laws and proceedings for the security of persons and property as is

enjoyed by white citizens, and shall be subject to like punishment, pains, penalties,

taxes, licenses, and exactions of every kind, and to no other."  Generally, a plaintiff

pursuing a section 1981 claim

> must allege facts in support of the following elements: (1) the plaintiff is a
> member of a racial minority; (2) an intent to discriminate on the basis of race by
> the defendant; and (3) the discrimination concerned one or more of the activities
> enumerated in the statute (i.e., make and enforce contracts, sue and be sued,
> give evidence, etc.).

Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993)

(citations omitted).  Further, in the context of an employment discrimination case, a

section 1981 claim requires proof of the same elements that constitute a Title VII claim.

White v. Eastman Kodak Co., 2010 WL 726629, at *1 n. 1 (2d Cir. March 3, 2010)

---

[8] In light of this court's July 26 Ruling (as well as the fact that the Union Defendants never moved to dismiss Jackson's Third Amended Complaint), the claims currently pending against the Union Defendants are those under section 1981, Title VII, and breach of the duty of fair representation under Conn. Gen. Stat. § 5-271(d).  In the July 26 Ruling, Jackson's claims under section 1983 and section 301 of the Labor Management Relations Act were dismissed without leave to replead.  The court does not revisit those claims, despite Jackson's apparent attempts to reassert them in the Third Amended Complaint.

(citing <u>Hudson v. Int'l Business Machines Corp.</u>, 620 F.2d 351, 254 (2d Cir.1980)).

It is undisputed that, in order to succeed on a Title VII claim against a union, a plaintiff must make a showing that the defendant breached its duty of fair representation.  <u>See</u>, <u>e.g.</u> <u>Agosto v. Correctional Officers Benev. Ass'n</u>, 107 F. Supp. 2d 294, 305 (S.D.N.Y. 2005).  Because employment discrimination claims under section 1981 are analyzed under the same framework as Title VII claims, Jackson must, in order to make out a section 1981 claim against the Union Defendants, establish a breach of the duty of fair representation.  <u>See</u>, <u>e.g.</u>, <u>McIntyre v. Longwood Central School Dist.</u>, 658 F. Supp. 2d 400, 2009 WL 3113261, at *18 (E.D.N.Y. 2009) (holding that plaintiff, in order to sue union for discrimination under section 1981, must establish a breach of the duty of fair representation) (citing <u>Nweke v. Prudential Ins. Co. of America</u>, 25 F. Supp. 2d 203, 221 (S.D.N.Y. 1998)).

In 2008, the SBLR concluded, based on the record in this case, that the Union Defendants did not breach their duty of fair representation to Jackson.  The Union Defendants maintain here that, because Jackson must show that the Union Defendants breached their duty of fair representation in order to prevail on her claim under section 1981, and because Jackson has already had a full and fair opportunity to litigate this issue before the SLRB, principles of claim preclusion and/or issue preclusion should preclude Jackson from re-litigating her section 1981 claim in federal court.

In <u>University of Tennessee v. Elliott</u>, 478 U.S. 788 (1986) (hereinafter "<u>Elliott</u>"), the Supreme Court held that, "when a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same

preclusive effect to which it would be entitled in the State's courts." Id. at 791 (internal quotation marks and citation removed).[9]  The Second Circuit has interpreted Elliot to stand for the proposition that

> state administrative fact finding unreviewed by a state court has preclusive effect in a subsequent . . . proceeding if the states in which those adjudications occurred would give them preclusive effect, and if the administrative proceedings satisfy three requirements: (1) the administrative agency acted in a judicial capacity; (2) the agency resolved disputed issues of fact properly before it; and (3) the parties had a full and fair opportunity to litigate the relevant factual issues.

DeSario v. Thomas, 139 F.3d 80, 86-87 (2d Cir. 1998) (vacated on other grounds). Notably, the fact that Jackson litigated her claim before the SBLR pro se does not influence the court's analysis.  As district courts within this Circuit have held, pro se litigants are bound by the same rules of preclusion as litigants represented by counsel, "despite the federal courts' generally flexible approach to pro se pleadings."  Kent v. New York City Dept. of Sanitation, 549 F. Supp. 570, 573 (S.D.N.Y. 1982); see also Carlin v. Gold Hawk Joint Venture, 778 F. Supp. 686, 693 (S.D.N.Y. 1991).  This court agrees.

       1.     Whether the SBLR Acted in a "Judicial Capacity"

Neither Jackson's Corrected Memorandum nor her Local Rule 56(a)(2)

---

[9]  The court is uncertain as to the basis for Jackson's argument that her section 1981 claim is not barred by principles of issue or claim preclusion.  Section IV.A of her Corrected Memorandum appears to offer a preclusion analysis as to all of Jackson's claims.  See Corr. Mem. at 5-8.  That Section, however, does not appear to acknowledge that the law of preclusion applies differently to claims under Title VII and section 1981.

       To the extent Jackson cites Elliott and its progeny for the proposition that her 1981 claim is not barred by principles of issue or claim preclusion, such citation is based on a clear misreading of Elliott. Jackson's Corrected Memorandum correctly notes that the rule articulated in Elliott, regarding unreviewed decisions of state administrative agencies, "explicitly exclude[s] Title VII claims." Corr. Mem. at 6 (citing DeCintio v. Westchester County Med. Center, 821 F.2d 111, 115 n.11 (2d Cir. 1987)).  However, this rule does apply to suits brought under the "Reconstruction civil rights statutes," including section 1981.  See Elliott, 478 U.S. at 791 n.1; 797-99.

statement seeks to refute the Union Defendants' argument that the SBLR acted in a "judicial capacity." The SBLR is a body that, pursuant to Connecticut state law, has jurisdiction over claims made by employees alleging a breach of the duty of fair representation. See Conn. Gen. Stat. § 10-153e(e) ("[W]henever a certified employee believes a breach of the duty of fair representation . . . has occurred or is occurring, such . . . certified employee shall file a written complaint with the State Board of Labor Relations."); see also Conn. Gen. Stat. § 5-273 (affording the SBLR the power to administer Conn. Gen. Stat. §§ 5-270 et seq., as well to "make, amend and rescind such rules and regulations as may be necessary" to carry out such statutory provisions).

Conn. Gen. Stat. § 5-274 sets forth quasi-judicial procedures that govern claims before the SBLR. After a complainant alleges a breach of the duty of fair representation, the SBLR is required to refer the complaint to an agent for investigation. Conn. Gen. Stat. § 5-274(a). The agent must then report back to the SBLR, recommending that the SBLR (a) dismiss the complaint; (b) investigate further; or (c) hold a hearing. Id. If the SBLR orders a hearing, it must give notice to all parties or their counsel of record. See Affidavit of Alexandra Gross at ¶ 5 (hereinafter "Gross Aff."). The respondent is statutorily permitted to file an answer to the SBLR complaint. Conn. Gen. Stat. § 5-274(a). At the hearing itself, "[e]ach party may conduct examination and cross-examination of witnesses and introduce into the record documents or other evidence subject to the ruling of the SBLR." Gross. Aff. at ¶ 7. While the SBLR is not "bound by the technical rules of evidence," all of the SBLR's findings must be based on "substantial evidence." Id. at ¶¶ 7, 8. The SBLR has the power to issue subpoenas, as well as to rule on motions that are made "related to the

conduct of a hearing." <u>Id</u>. at ¶¶ 9-10.  A party who loses before the SBLR has the right to appeal to state court.  <u>See</u> Conn. Gen. Stat. § 10-153e(g)(4); Conn. Gen. Stat. § 4-183(a).[10]

There is no indication in the record that Jackson lacked access to the procedures set forth by Conn. Gen. Stat. § 5-274, or that the SBLR was acting in anything other than a judicial capacity in ruling on Jackson's claim.  Moreover, the hearing provided for by the relevant statutory provisions has been characterized as one in which "the board appears to act in a judicial capacity."  <u>Oppenheim v. Gruell</u>, 2005 WL 407594, at *6 (Conn. Super. Ct. Jan. 11, 2005).  On this basis, the court concludes that the "judicial capacity" requirement has been satisfied in this case.

        2.    Whether the Agency Resolved Disputed Issues of Fact Properly Before It

Conn. Gen. Stat. § 5-274(c) provides that, "[i]f, upon all of the testimony, the board determines that a prohibited practice has not been or is not being committed, it shall state its finding of fact and shall issue an order dismissing the complaint."  In this case, there is little doubt that the SBLR resolved disputed issues of fact as to whether the Union Defendants breached their duty of fair representation to Jackson, and it stated those findings in its Decision dismissing Jackson's complaint.  Of the 41 pages that comprise the SBLR Decision, more than 30 are devoted to factual findings.  <u>See</u> SBLR Decision at 2-33.  The SBLR made detailed factual findings as to, <u>inter</u> <u>alia</u>, each

---

[10]  Conn. Gen. Stat. § 10-153e(g)(4) provides that "[a]ny party aggrieved by a final order of the board of labor relations granting or denying in whole or in part the relief sought may appeal pursuant to the provisions of chapter 54 to the superior court for the judicial district where the prohibited practice was alleged to have occurred, in the judicial district of New Britain, or in the judicial district wherein such party resides or transacts business."

grievance Jackson filed while she was employed by the CLC, Jackson's representation

by her Union, and Jackson's correspondence with Union officials.  Based upon the

SBLR's statement of its detailed findings contained in its decision dismissing Jackson's

complaint, the court concludes that this element is satisfied.

>    3.   Whether the Parties had a Full and Fair Opportunity to Litigate the
>         Relevant Factual Issues

Perhaps the paramount consideration in a determination of whether a party had

a full and fair opportunity to litigate in the previous action include the party's incentive to

litigate in that action.  State v. McDowell, 242 Conn. 648, 655-56 (1997).  Here, there is

no evidence, nor does Jackson argue, that she did not have an incentive to litigate the

issue of the Union Defendants' alleged breach of the duty of fair representation in the

action she brought before the SBLR.  To the contrary, the record indicates that Jackson

litigated the issue "vigorously."  S.E.C. v. Monarch Funding Corp., 192 F.3d 295, 304

(2d Cir. 1999).  The SBLR only reached a decision to dismiss Jackson's complaint after

eleven hearing days in 2005, 2006, and 2007.  Over the course of the hearing, Jackson

"requested 17 subpoenas for the production of documents and testimony of witnesses,"

fourteen of which subpoenas were issued by the SBLR.  See SBLR Decision at 1.  A

total of five witnesses testified over the course of the hearing, including Jackson, and

108 exhibits were "entered into the record."  Id.  In hearing Jackson's complaint, the

SBLR "issued six written rulings and procedural orders to address motions, counter

motions, and various requests of the parties."  Id.  Jackson additionally moved the

SBLR for summary judgment in September of 2007.  Id. at 2.  On the basis of the

foregoing facts, the court concludes that Jackson had a "full and fair opportunity to

litigate" her claim for breach of the duty of fair representation before the SBLR.

              4.      Whether Connecticut Law Would Give Preclusive Effect to the Factfinding of the SBLR

Under Connecticut law, "[c]ollateral estoppel, or issue preclusion, prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action. . . .   For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment." Waterbury Equity Hotel, LLC v. City of Waterbury, 85 Conn. App. 480, 493 (2004) (quotation marks and citation omitted); see also Lyon v. Jones, 291 Conn. 384, 406 (2009) ("[C]ollateral estoppel . . . is that aspect of res judicata that prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties or those in privity with them upon a different claim. . . . An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined.") (citation omitted).

As to whether the principles of issue or claim preclusion apply to the findings of an administrative agency, Connecticut law provides that, "[t]he governing principle is that administrative adjudications have a preclusive effect when 'the parties have had an adequate opportunity to litigate.' " Convalescent Center of Bloomfield, Inc. v. Department of Income Maintenance, 208 Conn. 187, 195 (1988) (quoting United States v. Utah Construction & Mining Co., 384 U.S. 394, 422 (1966)); see also Lafayette v. General Dynamics Corp., 255 Conn. 762, 773 (2001) ("As a general proposition, the governing principle is that administrative adjudications have a preclusive effect when

the parties have had an adequate opportunity to litigate. . . . [A] valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of res judicata [and collateral estoppel], subject to the same exceptions and qualifications, as a judgment of a court.") (citations omitted).  Notably, the doctrine of collateral estoppel only applies if the party against whom collateral estoppel is sought had access to judicial review after losing at the administrative level.  <u>Convalescent Center</u>, 208 Conn. at 195-202.  In this case, it is clear that Jackson had a right to appeal the SBLR decision to Connecticut Superior Court, but simply chose not to.  <u>See</u> Conn. Gen. Stat. § 10-153e(g)(4); Conn. Gen. Stat. § 4-183(a).[11]

As discussed <u>supra</u>, Jackson had an adequate opportunity to litigate her claim for breach of the duty of fair representation at the administrative level, and the record clearly indicates that she took full advantage of the SBLR hearing process.  The court concludes that Connecticut law would give preclusive effect to the findings of fact of the SBLR in the ruling dismissing Jackson's complaint.

### 5. Summary

On the basis of the foregoing factors, the court concludes that, under principles articulated by the Supreme Court in <u>Elliott</u>, Jackson should not be allowed to re-litigate the issue of whether the Union breached its duty to fairly represent her.  After its extensive determination of the facts of this case, the SBLR concluded that, while Jackson "did not and does not believe that the Union did enough on her behalf . . . . the record does not support [her] assertion that the Union acted in a way that violated its

---

[11] <u>See</u> note 10, <u>supra</u>.

duty of fair representation."  SBLR Decision at 38.  The SBLR also concluded that

"there is no evidence of any personal or other bias by Boland against [Jackson]."  Id.

Moreover, "[t]he fact that [Jackson] criticized the Union's efforts and took matters into

her own hands on more than one occasion does not prove that the Union was not

representing her.  It shows simply that Complainant was not satisfied with the Union's

efforts."  Id. at 38.  The court sees no reason to disregard these findings.

As stated supra, Jackson would need to show that the Union Defendants

breached their duty of fair representation in order to proceed on her section 1981 claim.

Because principles of collateral estoppel preclude Jackson from making such a

showing, summary judgment is granted to the Union Defendants on Jackson's section

1981 claim.

B.    Title VII

The Union Defendants argue that Jackson's Title VII claim should be dismissed

because Jackson's Third Amended Complaint fails to state a claim on which relief can

be granted.  See Fed. R. Civ. P. 12(b)(6).  In the July 26 Ruling, this court dismissed

Jackson's Title VII claims for failure to state a claim on the ground that such claims

merely "allege[d] that the Union Defendants breached the duty of fair representation."

July 26 Ruling at 6.  The Union Defendants now argue that the Title VII claims

contained in the Third Amended Complaint similarly fail to state a claim, because such

claims are almost identical to the Title VII claims contained in the First Amended

Complaint.  See Mem. in Supp. at 38.

Under Fed. R. Civ. P. 12(h)(2), "[f]ailure to state a claim upon which relief can be

granted . . . may be raised (A) in any pleading allowed or ordered under Rule 7(a); (B)

16

by a motion under Rule 12(c); or (C) at trial."  In this case, the Union Defendants'

Answer to the Third Amended Complaint raises the defense of failure to state a claim

on which relief can be granted.  Answer at 13.  Moreover, "because the defense of

failure to state a claim can be raised as an issue at a trial on the merits, the question of

whether there is a genuine issue for trial with regard to that defense, is appropriately

considered on a motion for summary judgment."  Kornblum v. St. Louis County, Mo., 48

F.3d 1031, 1038 (8th Cir. 1995) (opinion vacated on other grounds); see also Eastway

Const. Corp. v. City of New York, 762 F.2d 243, 250 (2d Cir. 1985) ("Although Judge

Weinstein relied on the affidavits submitted in support of the Rule 56 motion, and thus

granted summary judgment, we believe it would have been equally proper to dismiss

the civil rights count for failure to state a claim, pursuant to Rule 12(b)(6)."); Schwartz v.

Compagnie General Transatlantique, 405 F.2d 270, 273 (2d Cir. 1968) ("Where

appropriate, a trial judge may dismiss for failure to state a cause of action upon motion

for summary judgment."); Martin v. Southwestern Va. Gas Co., 135 F.3d 307, 309 n.1

(4th Cir. 1998) ("[I]f defense of failure to state a claim is raised in defendant's Answer,

the defense is not subject to waiver and may be asserted in any subsequent motion for

summary judgment.") (citing Daingerfield Island Protective Soc'y v. Lujan, 797 F. Supp.

25, 29 (D. D.C.1992)).

    The Title VII allegations contained in Jackson's Third Amended Complaint are

nearly identical to those that were dismissed in the July 26 Ruling.  In total, the Third

Amended Complaint contains 128 paragraphs.[12]  While the organization of the Third

---

[12] The paragraphs are labeled 1-129, but there is no paragraph numbered 22.

Amended Complaint is somewhat different from the organization of the First Amended Complaint, the vast majority of the Third Amended Complaint has been lifted verbatim from the First Amended Complaint.  Counts Two and Three[13] of the Third Amended Complaint allege violations of Title VII.  However, of the more than sixty paragraphs and subparagraphs contained in those counts, only seven contain new factual and/or legal allegations.  See Third Am. Comp. at ¶¶ 24, 24a, 56-59, 68.

The court concludes that Jackson's Third Amended Complaint is not sufficiently different from the First Amended Complaint that it states a Title VII claim.  As this court stated in its July 26 Ruling, "Section 703(c)(3) [claims] are generally brought by plaintiffs who claim that their union caused the employer to discriminate, 'for example, by maintaining a discriminatory seniority system, . . .; with acquiescing in the employer's administration of facially neutral tests that had an adverse impact on plaintiffs, . . .; by helping the employer to discriminate by failing to process sexual harassment complaints . . . ."  Byars v. Jamestown Teachers Ass'n, 195 F. Supp. 2d 401, 411 (W.D.N.Y.2002).  The only new paragraph contained in the Third Amended Complaint that might potentially alter the court's conclusion from the July 26 Ruling is paragraph 24, which states, inter alia, that "[p]laintiff asserts that the Union Defendants caused the employer to discriminate against Plaintiff in violation of Title VII . . . ."  Third Am. Comp. at ¶ 24.

---

[13] The Third Amended Complaint includes two subsections labeled "Count III."  See Third Am. Comp. at 11, 18.  The first "Count III," which is entitled "Additional Acts of Aiding and Abetting the Employer" and appears on page 11 of the Third Amended Complaint, appears to allege a cause of action that is indistinct from that alleged in Count Two.

The reference to "Count Three" above in the text is to the second "Count III," which is entitled "Racial Discrimination/Facially Neutral Tests/Disparate Treatment" and appears on page 18 of the Third Amended Complaint.  The court construes this "Count III" as a claim against the Union Defendants under "Section 703(c)(3) of Title VII."  See Third Am. Comp. at ¶ 55.

Despite this assertion, Jackson has alleged no new facts on which the court could reasonably infer that the Union Defendants caused the CLC to discriminate against her. In other words, the factual basis (or rather, the lack thereof) supporting paragraph 24 of Jackson's Third Amended Complaint is identical to the factual basis supporting Jackson's Title VII claims as alleged in the First Amended Complaint.  Therefore, the allegation contained in paragraph 24 of the Third Amended Complaint, without more, is conclusory, and it does not alter the court's July 26, 2007 Ruling that Jackson has failed to state a Title VII claim against the Union Defendants.[14]

Jackson's Corrected Memorandum does not appear to directly respond to the argument that the Title VII claim contained in Jackson's Third Amended Complaint is merely a repetition of the Title VII claim that was already dismissed by this court for failure to state a claim.  However, the Corrected Memorandum argues that the applicable *standard* as to whether Jackson has stated a claim for a Title VII violation against the Union Defendants comes from Agosto v. Correctional Officers Benevolent Ass'n, 107 F. Supp. 2d 294, 303 (S.D.N.Y. 2000).  In Agosto, the district court rejected the "Bugg test," see Bugg v. Int'l Union of Allied Indus. Workers, Local 507, 674 F.2d 595 (7th Cir. 1982), for union liability under Title VII as too narrow a statement of law. Agosto, 107 F. Supp. 2d at 403.  In Bugg, the Seventh Circuit held that:

---

[14] The Union Defendants' Local Rule 56(a)(1) Statement alleges that, "[r]ather than replead her claims pursuant to the Ruling, the plaintiff simply rearranged the allegations of her amended complaint . . . and added a few conclusory statements . . . ."  L. R. 56(a)(1) at ¶ 148.  Jackson's Local Rule 56(a)(2) Statement denies that allegation, asserting that "[t]he pleadings are sufficient in the federal rules of civil procedure [sic] to set forth Plaintiff's claims."  L. R. 56(a)(2) at ¶ 148.  Beyond this bald statement, paragraph 148 of Jackson's Local Rule 56(a)(2) Statement does not provide any insight as to why Jackson's Third Amended Complaint is sufficiently different from her First Amended Complaint as to state a claim under Title VII on which relief can be granted.

19

> To establish a claim against the Union, the plaintiff was required to show: (1) that the company committed a violation of the collective bargaining agreement with respect to the plaintiff; (2) that the Union permitted that breach to go unrepaired, thus breaching its own duty of fair representation; and (3) that there was some indication that the Union's actions were motivated by racial animus.

Bugg, 674 F.2d at 598 n.5.  The Agosto court, by contrast, held that "all that is required to state a Title VII claim against a union is a breach of the duty of fair representation because of race, color, religion, sex, or national origin."[15]  107 F. Supp. 2d at 305.

Admittedly, the Agosto holding as to the standard for union liability under Title VII is facially in tension with this court's statement in the July 26 Ruling that Jackson's Title VII claim must be dismissed because it " 'simply set forth allegations that the Union Defendants breached the duty of fair representation.' " July 26 Ruling at *3 (quoting Union Defendants' Memorandum in Support of Motion to Dismiss).   However, the aforementioned standard set forth in Agosto is applicable to claims under section 703(c)(1), rather than section 703(c)(3).  Agosto, 107 F. Supp. 2d. at 303 (citing 42 U.S.C. § 2000e-2(c)(1)).  In the July 26 Ruling, the court construed the Title VII claim contained in Jackson's First Amended Complaint as brought under section 703(c)(3), rather than section 703(c)(1).  The court sees no reason to stray from that construction. Section 703(c)(3) makes it unlawful for a labor organization "to cause or attempt to cause an employer to discriminate against an individual in violation of this section."  In contrast, section 703(c)(1) makes it unlawful for a labor organization to "exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin."

---

[15] The court notes that, while Agosto's rejection of the Bugg test has been cited approvingly by various district courts, it has not been adopted by the Second Circuit.

The Third Amended Complaint contains no indication that the legal basis underlying Jackson's suit has changed since the First Amended Complaint.  Compare, e.g., Third Am. Comp. at ¶ 2 with First Am. Comp. at ¶ 1.  Indeed, as stated supra, the Third Amended Complaint is nearly identical to the First Amended Complaint. Moreover, the basis of the Title VII claim contained in Count Two of Jackson's Third Amended Complaint is clearly stated in paragraph 24: "Plaintiff asserts that the Union Defendants *caused the employer to discriminate* against Plaintiff in violation of Title VII."  Third Am. Comp. at ¶ 24 (emphasis added).  The basis of Count Three is also clear, as the second paragraph of that count of the Third Amended Complaint quotes section 703(c)(3) verbatim.[16]  Third Am. Comp. at ¶ 55.  In sum, the court sees no reason to reconsider its construction of Jackson's Title VII claim as one brought under section 703(c)(3).[17]  Given that Jackson has failed to state a claim under section

_____

[16] This construction of the Third Amended Complaint is also supported by Jackson's own view of her Title VII claim, as indicated in her Memorandum in Opposition to the Union Defendants' Motion to Dismiss.  In that Memorandum in Opposition, Jackson clearly stated  that her Title VII claim was based on section 703(c)(3).  See Mem. in Opp. at 25 (Doc. No. 58).  Jackson's Memorandum in Opposition contained no mention of section 703(c)(1).

Notably, while Jackson is now represented by counsel, her Memorandum in Opposition to the Union Defendants' Motion to Dismiss (as well as her Third Amended Complaint) was filed pro se. However, it is clear to the court that Attorney Miller, after she began her representation in this matter, could have moved to file an additional amended complaint that explicitly included a claim under Section 703(c)(1), if Jackson intended to plead such a claim.  Cf. Hanna v. Brown, 1995 WL 103789, at *2 (N.D. Ill. March 6, 1995) ("[O]nce [plaintiff] retained an attorney, his original pro se status no longer entitled him to a liberal interpretation of his pleadings. Although plaintiff initiated the complaint to the [board] pro se, counsel could and should have added the charge of racial discrimination by amending the complaint, filing a post hearing pleading, or by alleging racial discrimination in the subsequent EEOC charge."); but see Braphman-Bines v. New York City Police Dept., 2005 WL 22843, at *2 (S.D.N.Y. Jan. 3, 2005) ("[I]t is an open question whether the stricter standard governing dismissal of pro se complaints is appropriate" when a litigant subsequently becomes represented by counsel.").

[17] Even in the unlikely event that Jackson sought to plead a claim under section 703(c)(1) in her Third Amended Complaint, such a claim would fail.  While the Third Amended Complaint appears to allege that the Union Defendants breached their duty of fair representation to Jackson, the Third Amended Complaint contains no plausible factual basis from which to conclude that such breach occurred because of Jackson's race, color, or sex.  Agosto, 107 F. Supp. 2d 294, 305 (S.D.N.Y. 2000).

The Third Amended Complaint contains an allegation that the Union defendants were "[m]otivated

703(c)(3), that claim is dismissed.

Even if this court concluded that Jackson had stated a claim under section 703(c)(3), the court would grant summary judgment on that claim to the Union Defendants. To begin, summary judgment would be granted on Jackson's claims against Boland, Miller, and other individuals against whom Jackson intended to bring a Title VII claim, because "[l]iability under Title VII is limited 'to employer-<u>entities</u> with fifteen or more employees." <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1314 (2d Cir. 1995) (emphasis added), abrogated on other grounds, <u>Burlington Ind. v. Ellerth</u>, 524 U.S. 742,(1998). Indeed, "individuals are not subject to liability under Title VII." <u>Patterson v. County of Oneida, N.Y.</u>, 375 F.3d 206, 221 (2d Cir. 2004) (citation omitted).

Further, Jackson has presented no evidence that the Union itself instigated, aided, or otherwise "actively supported" any discrimination allegedly committed by the CLC. <u>See</u> <u>Byars</u>, 195 F. Supp. 2d at 411; <u>Eliserio v. United Steelworkers of America Local 310</u>, 398 F.3d 1071, 1076-77 (8th Cir. 2005) (stating that, under section 703(c)(3), "a union may be held liable under Title VII if the [u]nion itself instigated or

---

by hostility and racial animus" in breaching their duty of fair representation with respect to certain harassment and hostile work environment grievances that Jackson wished to file against the CLC in 2003 and 2004, but that the Union did not pursue. <u>See, e.g.</u>, Third Am. Comp. at ¶¶ 53, 44. Jackson alleges that the Union Defendants pursued similar grievances on behalf of two Caucasian employees, Kristen Person and Rosemary Cusano. <u>Id.</u> at ¶ 53.

Construing such allegations as a cause of action under section 703(c)(1), the court concludes that Jackson's claim of racial animus against the Union Defendants is implausible and could not survive the pleading standard set forth by Fed. R. Civ. P. 8(a). Besides the allegation that the Union filed similar grievances on behalf of two Caucasian employees of the CLC, there are no factual allegations contained in the Third Amended Complaint that raise any inference that the Union may have discriminated against Jackson due to racial animus. Moreover, the Third Amended Complaint acknowledges that, between 2002 and 2003, the Union filed nine grievances on Jackson's behalf and represented Jackson in a variety of hearings and proceedings. <u>See, e.g.</u>, <u>Id.</u> at ¶¶ 20, 41. Without more, the fact that the Union at some point declined to file additional grievances on Jackson's behalf in no way makes it plausible that such actions were motivated by a discriminatory purpose.

actively supported the discriminatory acts") (citation omitted).  It is undisputed that the Union, between 2002 and 2003, filed nine grievances on Jackson's behalf and represented Jackson in a variety of hearings and proceedings.  <u>See</u>, <u>e.g.</u>, Third Am. Comp. at ¶¶ 20, 41.  While it is clear that Jackson was unhappy with the manner in which the Union pursued her grievances, <u>see</u>, <u>e.g.</u>, Jackson Aff. at ¶¶ 29-30, 33, 37, 38, 44, there is simply no evidence that the Union caused or assisted the CLC to discriminate against her on account of her race or gender.  <u>See</u>, <u>e.g.</u>, <u>Anjelino v. New York Times Co.</u>, 200 F.3d 73, 95-96 (3d Cir.1999) ("While a union may be held liable under Title VII, the record here does not demonstrate that the Union itself instigated or actively supported the discriminatory acts allegedly experienced by the appellants. Therefore, the Union is not liable.").  There is, further, no evidence that the Union "pursue[d] a policy of rejecting disparate-treatment grievances" filed by women or African Americans in general.  <u>Goodman v. Lukens Steel Co.</u>, 482 U.S. 656, 669 (1987) (superseded by statute on other grounds).[18]  If anything, the record strongly indicates Jackson's view that the Union inadequately represented her because of a personal grudge held against her by Boland.  <u>See</u> Third Am. Comp. at ¶ 20 ("Because . . . Boland habored a personal animus against [Jackson] . . . Boland did not monitor the grievances.").  Therefore, there are no material issues of fact and summary judgment lies against plaintiff's Title VII claim.

---

[18]   The fact that Jackson may have expressed to the Union her belief that "the rules [at the CLC] were not applied the same to [Jackson] as to the white clerical employees," and that the Union subsequently "ignored" such assertions, does not lead to the conclusion that the Union assisted any discrimination that may have been committed by the CLC.  Jackson Aff. at ¶ 30.

C.      Conn. Gen. Stat. § 5-271(d)

Because this court has disposed of all of Jackson's federal claims on the grounds discussed above, it will decline to exercise supplemental jurisdiction over any state claims that Jackson may have asserted in the Third Amended Complaint.  See 28 U.S.C. § 1367(c)(3).

## VII.    MOTION TO STRIKE (Doc. No. 340)

Because the court grants summary judgment on the grounds of collateral estoppel and failing to state a claim on which relief can be granted, the court has not relied on the statements challenged in the Union Defendants' Motion to Strike. Therefore, the Motion is denied as moot.

## VI.    CONCLUSION

For the foregoing reasons, the court **GRANTS** the Union Defendants' Motion for Summary Judgment (Doc. No. 309) in its entirety.  The Motion for Leave to File Excess Pages (No. 339) and the Motion to Strike (Doc. No. 340) are **DENIED**.


**SO ORDERED.**

Dated at Bridgeport, Connecticut this 29th day of March, 2010.



/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge